UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:12-CR-57-F1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| COREY CONNELL CARROLL, | ) | |
| Defendant. | ) | |

This matter was scheduled for hearing on the Defendant's Motion to Suppress Evidence Tied to Unnecessarily Suggestive Photographic Identifications [DE-54], on May 28, 2013, at 10:30 a.m. The case is scheduled for arraignment and trial on July 22, 2013.

The Government was represented at the suppression hearing by Assistant United States Attorney Rudy Renfer. The defendant, Corey Connell Carroll, was present with his counsel, Josh Howard and W. Michael Dowling.[1] Based on the evidence produced during the hearing, the court renders the following:

**FINDINGS OF FACT**

1. As part of an ongoing investigation into the alleged drug trafficking activities of co-defendant Antwon Obey, officers with the Johnston County Sheriff's Department ("JCSD") engaged a confidential informant to arrange a controlled purchase of cocaine base from Obey. Detective Jason Guseman from the JCSD was the lead detective and Detective Adam Dunn of the JCSD provided assistance. The controlled purchase took place on July 30, 2011.

---

[1] Mr. Dowling cross examined the Government's witnesses and argued the case on behalf of the defense team. He is a member of the CJA panel training group.

2. Detective Guseman testified that he searched the confidential informant prior to the controlled purchase. After confirming that the informant was not possession of any contraband, Detective Guseman provided the informant with $1,200. The informant advised that he could purchase approximately one ounce of cocaine base (typically referred to as "crack") for $1,200. Detective Guseman testified that $1,200 is the approximate price for an ounce of cocaine base in the Smithfield area.

3. Detective Guseman testified that the confidential informant attempted to contact Obey several times to arrange the purchase. However, the confidential informant was unable to reach Obey.

4. After it became clear that the confidential informant could not reach Obey, Detective Guseman and the informant agreed that the informant would attempt to find Obey at "the spot" in Smithfield, N.C., an open air drug market where the informant had purchased narcotics from Obey in the past.

5. The confidential informant allegedly met Carroll at "the spot" and inquired about purchasing an ounce of cocaine base. After Carroll allegedly told the informant that he could provide an ounce of cocaine base and after they negotiated for several minutes regarding the price, the confidential informant contacted Detective Guseman by telephone and advised that he could purchase the cocaine base from "Corey." The informant did not provide Corey's last name. Detective Guseman testified that he instructed the informant to purchase the cocaine.

6. Detective Guseman testified that the informant later advised him that he had met Carroll "several times" over the years. Because the informant knew Carroll from these previous meetings, the informant was able to identify the seller as "Corey" to officers when he called.

7. Detective Guseman testified that Carroll provided approximately nineteen grams of cocaine base to the informant at "the spot." Carroll allegedly informed the confidential informant that he needed to retrieve the remainder of the cocaine (approximately 9 grams) from a different location. Allegedly, Carroll and the informant arranged to meet at the informant's grandmother's house, which is located near "the spot."

8. Detective Guseman testified that the informant called him a second time after he reached his grandmother's house and again advised that he was purchasing the ounce of cocaine base from "Corey." The informant did not provide Corey's last name. The informant advised Detective Guseman that Corey needed to retrieve the remainder of the cocaine and that he was waiting at his grandmother's house to complete the transaction.

9. Carroll allegedly arrived at the informant's grandmother's house a short time later and provided the remainder of the cocaine. The informant then allegedly gave Carroll the $1,200.

10. Detective Guseman testified that the informant returned to a pre-arranged meeting spot approximately ten to fifteen minutes after the informant contacted Detective Guseman from his grandmother's home. Detective Guseman searched the informant and the only contraband recovered was the ounce of cocaine base that Detective Guseman instructed the informant to purchase. The substance field tested positive for cocaine.

11. After searching the informant, the Detectives began working with the informant to further identify the "Corey" who allegedly sold the informant the ounce of cocaine base. On his laptop computer, Detective Dunn showed the informant at least two pictures of persons with the first name "Corey" and who the JCSD knew to be involved with narcotics in the Smithfield, N.C. area. The pictures were displayed on the computer one at a time (*i.e.* not in a lineup consisting of

3

multiple pictures). The informant advised that the first two pictures were not the "Corey" who sold the informant the cocaine base.

12. After exhausting all the pictures of the "Corey's" known to the JCSD, Detective Dunn contacted the Smithfield Police Department and inquired if they knew of any possible suspects involved in narcotics trafficking in the Smithfield area with the first name "Corey." The Smithfield Police Department suggested trying the Defendant, Corey Carroll. Detective Dunn pulled up a "mugshot" of Carroll from a previous arrest on his laptop computer. The informant positively identified Carroll as the person who sold him the cocaine base.

13. Detective Dunn testified that the informant made this identification within approximately fifteen minutes of leaving the meeting that allegedly took place between the informant and Carroll.

14. Both Detective Guseman and Detective Dunn testified that the informant was shown one image of Carroll, by itself, unaccompanied by a lineup of "filler" images.

15. The Detectives also both testified that neither of them obtained the informant's "confidence level" when making the identification. However, the detectives testified that the informant quickly made the identification and his body language and tone of voice indicated that he was confident that he made the correct identification.

16. Neither Detective advised the informant that the suspect might not be in the sequence of individual photographs, that the informant should not feel compelled to make an identification, or that it was as important to exclude innocent persons as it was to positively identify the suspect.

4

17. The detectives did not engage a neutral officer (*i.e.* someone not involved in the investigation) to display the individual photographs, nor did they record the identification process.

18. North Carolina state court records[2] reveal that the confidential informant was cooperating with law enforcement authorities as part of a plea arrangement with state prosecuting authorities. In exchange for satisfactory cooperation efforts, the informant was entitled to a substantial sentence reduction. However, the plea agreement specifically states that the informant must cooperate to the full and complete satisfaction of law enforcement officials to receive the sentence reduction.

19. The state court records also reveal that the informant has a seventh grade education. Detective Guseman testified that the informant had no problems communicating with the detectives during the controlled purchase and that the informant fully understood all of his instructions and questions.

## ANALYSIS

Carroll submits that the eyewitness identification process was impermissibly suggestive and therefore violated his Fifth Amendment due process rights. Carroll argues that the appropriate remedy is suppression at trial of any testimony regarding the out-of-court identification, as well as any in-court identification of Carroll as the person who sold the cocaine base on the July 30, 2011.

---

[2] These records were admitted as evidence for purposes of the suppression hearing only. The court takes no position at this time as to the admissibility of these records at trial.

5

The Fifth Amendment's due process clause protects criminal defendants from impermissibly suggestive eyewitness identification. *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *United States v. Saunders*, 501 F.3d 384, 389 (4th Cir. 2007). The test for admissibility of identification testimony proceeds in two steps: (1) the defendant must demonstrate that the procedure was impermissibly suggestive; (2) if the procedure was impermissibly suggestive, the court must examine whether the identification is reliable despite the suggestive procedure, under the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977); *Saunders*, 501 F.3d at 389-90; *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996). An unreliable out-of-court identification renders a subsequent in-court identification inadmissible because "the witness thereafter is apt to retain in his memory the image of the photograph rather than the person actually seen . . . ." *Simmons v. United States*, 390 U.S. 377, 383-84 (1968).

Under the second step of the test for admissibility of identification testimony—whether the identification is reliable under the totality of the circumstances—the court examines the following factors:

> (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time; (3) the accuracy of the witness's initial description of the suspect; (4) the witness's level of certainty in making the identification; and (5) the length of time between the crime and the identification.

*Saunders*, 501 F.3d at 391; *United States v. Johnson*, 114 F.3d 435, 441 (4th Cir. 1997).

Here, the court proceeds directly to the reliability of the identification (the second step) because it is dispositive. With regard to the first factor, the informant had ample opportunity to view the suspect at the time of the sale of the narcotics. He met Carroll at "the spot" and initially spent several minutes negotiating about the price of the cocaine base. Then, he met with Carroll again at his grandmother's house to obtain the remainder of the cocaine base and provide the

6

money. As to the second factor, nothing at the hearing or in the parties' briefing suggests the informant did not pay attention close attention to the identity of the person from whom he was purchasing the cocaine. On the contrary, the witness had a substantial incentive to pay close attention to the person he was dealing with: if he approached a dealer whom he did not know at "the spot," he may have been robbed of the $1,200 the police provided him.

While the informant did not provide an initial description of the subject (the third factor), the court is comfortable disregarding this factor for several reasons. First, the informant provided the first name of the suspect to law enforcement three separate times before he was shown any photographs of the suspects. Then, after police showed him two photographs of individuals named "Corey" who officers knew to be involved with narcotics in the Smithfield area, the informant stated that those persons were not the suspect. As will be discussed below, this fact substantially increases the reliability of the identification. The informant was not simply attempting to curry favor with law enforcement authorities by positively identifying any subject shown to him. The exclusion of the two initial photographs suggests the informant was attempting to make an accurate identification of the person who sold him cocaine base.

Finally, while officers did not specifically ask the informant how confident he was in the identification (the fourth factor), both officers testified that the informant quickly identified Carroll when shown his photograph, and that his body language indicated that he was "certain" when he made the identification. The fact that the informant made the identification within approximately fifteen minutes of completing the narcotics purchase also increases the reliability of the identification (the fifth factor).

7

Thus, the identification in this case was obviously reliable under the *Saunders* and *Johnson* factors. Four of the five factors weigh in favor of a finding that the identification was reliable: the informant's opportunity to view the suspect, his degree of attention at the time, his degree of certainty, and the short time span between the crime and the identification. Furthermore, the fact that the informant excluded two potential suspects before making the positive identification suggests the informant was attempting to make an accurate identification, as opposed to simply trying to curry favor with law enforcement.

The court also notes that this particular identification process was likely not even impermissibly suggestive. As Carroll points out, identification procedures in which a witness is shown only a single photograph of a suspect, as opposed to an array of photographs, are disfavored in the Fourth Circuit. *See Johnson*, 114 F.3d at 442 ("[The witness] was shown a single photograph, in a federal courtroom surrounded by law enforcement personnel, [and the witness was] facing substantial time. Under these circumstances, we may assume that the showing of a single photograph would be unduly suggestive."); *United States v. Porter*, 338 Fed. Appx. 300, 2009 WL 2158098, at *5 (4th Cir. July 21, 2009) (approving of on the scene "show up" where witness is shown only the suspect in limited circumstances). However, the circumstances of this case make it an exception to this general principle.

Here, the informant initially provided the suspect's first name. After the informant provided the name, detectives completed a search of the Johnston County Sheriff's Department records and identified two individuals named "Corey" who had been involved in narcotics. The informant then excluded both of those individuals. Under these circumstances, the officers could reasonably assume that the informant was attempting to make an accurate identification because

8

he excluded the first two photographs. Showing a third individual photograph, under these conditions, is not impermissibly suggestive.

The implication of Carroll's argument is that every police eyewitness identification procedure must include a full photographic array, which includes the suspect and multiple "filler" photographs. The court is reluctant to support such a broad approach. Where, as here, the officers are working undercover with confidential informants near an open air drug market, it may not be practicable to provide a complete photographic array. Under the circumstances present here, where the informant's exclusion of the first two photographs strongly suggests the witness is making an honest attempt to identify the real suspect, the court finds that showing the informant one photograph is not impermissibly suggestive.

Finally, Carroll argues that the identification procedures in this case did not comply with the North Carolina Eyewitness Identification Reform Act, N.C. Gen. Stat. § 15A-284.51 *et seq*. The Eyewitness Identification Reform Act ("EIRA") provides a comprehensive set of procedures that North Carolina Law Enforcement officers must follow when a witness is making an eyewitness identification. The EIRA requires that the lineup be completed by an independent administrator. *Id.* § 284.52(b)(1). Among other things, the administrator must instruct the eyewitness that the suspect may not be in the lineup, that the administrator does not know the suspect's identity, that the eyewitness should not feel compelled to make an identification, and that it is as important to exclude innocent persons as it is to identify the suspect. *Id.* § 284.52(b)(3). The EIRA requires at least five "filler" photographs in addition to the suspect's photograph. *Id.* § 284.52(b)(5).

9

Unquestionably, law enforcement did not follow these procedures when it showed the informant Carroll's photograph. While acknowledging that this court is not bound by the provisions of the EIRA, Carroll argues that the court should nevertheless enforce its provisions. For example, Carroll argues that

> [t]he EIRA reflects a watershed shift in the way North Carolina State, county, and local law enforcement agents must conduct the criminal investigatory process. If this Court does not sanction state actors who flout the EIRA's provisions with impunity, then the EIRA will surely fall short of its mission . . . since government agents will be encouraged to bypass compliance with the EIRA, confident in the knowledge that the federal courts will ignore those violations.

Supplemental Mem. of Law in Supp. of Def.'s Mot. to Suppress [DE-100] at 13-14. Carroll also notes that in *Saunders*, the Fourth Circuit concluded that law enforcement's failure to follow their own departmental lineup procedures "exacerbated" the suggestive nature of the photograph. *Saunders*, 501 F.3d at 390-91.

*Saunders* itself forecloses Carroll's argument that the court should suppress the identification testimony because law enforcement did not follow the EIRA procedures. In *Saunders*, the Fourth Circuit concluded that the photograph was impermissibly suggestive and that law enforcement may have remedied the problem by following their own internal procedures. However, whether the photograph is impermissibly suggestive is only half the test. Proceeding to the second step—whether the identification is nevertheless reliable under the totality of the circumstances, despite the impermissibly suggestive photograph—the *Saunders* court held that the identification was reliable and thus the district court did not err when it admitted the identification testimony. *Id.* at 391-93.

As in *Saunders*, the court here has found that the identification was reliable under the circumstances, using the factors set forth in *Johnson* and *Saunders*. The procedures in the EIRA

10

are only relevant to the first half of the test for admissibility of identification testimony: whether the procedure was impermissibly suggestive.[3] Where, as here, the identification is reliable despite a complete failure to follow the EIRA procedures, the testimony is still admissible. *Id.* at 389 ("The consideration of whether the identification testimony is admissible proceeds in two steps."); *Johnson*, 114 F.3d at 441 ("In determining whether identification testimony is admissible, a two-step analysis is required."). Thus, both the out-of-court identification and any in-court identification based on this transaction are admissible.

## CONCLUSIONS OF LAW

1. The eyewitness identification by the confidential informant on July 30, 2011 was reliable under the factors set forth in *United States v. Saunders*, 501 F.3d 384, 391 (4th Cir. 2007) and *United States v. Johnson*, 114 F.3d 435, 441 (4th Cir. 1997).

2. Testimony regarding the out-of-court identification is therefore admissible unless otherwise precluded by the Federal Rules of Evidence.

3. In-court identification of the Defendant based on the July 30, 2011 transaction is also admissible unless otherwise precluded by the Federal Rules of Evidence.

4. Carroll has abandoned any argument regarding the suggestiveness or reliability of the identifications described in "Exhibit A" in the Government's response to Carroll's motion [DE-59]. Carroll was made aware of these identifications by at least November 11, 2012, but chose

---

[3] The court notes here that law enforcement's failure to follow the EIRA procedures does not make the identification per se impermissibly suggestive for purposes of the Fifth Amendment due process challenge. The test remains whether the "identification procedure is so impermissibly suggestive as to give rise to the very substantial likelihood of misidentification." *Simmons*, 390 U.S. at 384. As the court has explained, the informant's exclusion of the first two photographs reduces the likelihood that the informant misidentified Carroll.

11

Case 7:12-cr-00057-F Document 105 Filed 05/30/13 Page 11 of 13

not to include any specific evidence or argument regarding those identifications at the suppression hearing. As Carroll has the burden of proof regarding a challenge to the admissibility of identification testimony, *Johnson*, 114 F.3d at 441, the motion to suppress the Exhibit A identifications is deemed abandoned.

## SUMMARY

In summary, and for the foregoing reasons, Carroll's motion to Suppress [DE-54] is DENIED. In addition, the Government's Motion for Hearing to Determine Whether Defendant's Attorney Should be Disqualified from Representing Defendant [DE-80] is DENIED. In open court on May 28, 2013, the court questioned Carroll regarding whether he wanted to proceed with Mr. Howard as his lawyer. Carroll answered in the affirmative. The court sees no need to address the details of all of Carroll's letters to the court [DE-41, -72, -79, -85], as the Government requests in its "Motion for Hearing." Most of Carroll's letters express displeasure about the criminal charges brought against him. To the extent Carroll's letters suggest dissatisfaction with his lawyer, Carroll's statement in open court that he was satisfied proceeding with his current counsel obviates any need to further address the lawyer/client relationship. If either party feels the court needs to address these letters further than what occurred in open court on May 28, 2013, they are free to submit additional motions.

SO ORDERED.

This the 30th day of May, 2013.

                                                                          JAMES C. FOX  
                                                                         Senior United States District Judge